UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMAL RANDLE,

          Petitioner,                        Case Number: 04-10322
                                                    Honorable David M. Lawson

v.

ANDREW JACKSON,

          Respondent.
_____/

## OPINION AND ORDER  DENYING PETITION FOR WRIT OF HABEAS CORPUS

The petitioner, Jamal Randle, presently confined at the Boyer Road Correctional Facility in Carson City, Michigan, has filed a *pro se* application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his convictions and prison sentences for armed robbery, Mich. Comp. L.  § 750.529, and possession of a firearm in the commission of a felony, Mich. Comp. L.  § 750.227b.  The robbery in this case took place on January 10, 1994, Randle was arrested for the offense sometime in December 1998, and trial began in the Wayne County, Michigan circuit court on November 14, 1999.  The petitioner contends that the delay both before and after his arrest deprived him of rights under the Constitution.  He also alleges that his attorney's performance was substandard.  The respondent has filed an answer to the petition asserting that the claims lack merit because the state court of appeals decided the federal issues correctly.  The Court agrees; therefore, the petition will be denied.

### I.

The petitioner's convictions arise from the January 10, 1994, robbery of Frank Harris.  The petitioner was not formally charged with the alleged crime until five years later, on December 30, 1998.  The trial evidence showed that the pre-arrest delay resulted from the inability to identify the

petitioner by name and locate him. The petitioner defended at trial against the charges on the bases that he was not the robber, and he was not physically capable of performing the acts described by the State's witnesses.

Frank Harris, the robbery victim, testified that on January 10, 1994 at around 7 p.m. he was with his eight-year-old son on Superior Street in Detroit, Michigan in front of the home of Ms. Annie Cook (his son's grandmother). A man with a rifle ran up to him, pointed the rifle at his head, and ordered him to lie face down on the ground. Harris complied. As he was lying face down, the robber took his cash, his wallet, and other personal items. Harris testified that in spite of the darkness, he was able to see the robber's face because of the street light. Harris also said that he could see the robber's face because the robber was standing directly over him. He said that when the robber went through his pockets, the robber's face was very close to his; and when the robber asked him questions Harris said that he turned and looked directly at the robber's face. Harris said that he had never seen the robber before. At trial, he identified the petitioner as the robber.

According to Harris, hiding behind a dumpster was a second man who was wearing an overcoat and had something covering his eyes, like goggles or a ski mask. Harris testified that the second man had his hand positioned at his waist, suggesting that he had a weapon. It was Harris's impression that the second man was a lookout. Harris said that after robbing him, the robber told him to run. Harris complied, and as he did so he looked behind him and saw the robber and the other man running at a slow pace in the opposite direction. Harris did not see whether the robber was limping.

That night Harris went to the police department and reported the robbery to an Officer Clarence Lucas, whom he knew. Harris could not identify the robber by name, but he gave the

officer a general description of him.  Officer Lucas then gave the report to the detectives at the precinct; the detectives however did not talk to Harris.

About three to six months after the robbery while Harris was working at a pawn shop, he saw the man who robbed him come into the shop carrying a large television set.  Harris testified that the robber was with an older gentleman who appeared to be around fifty or sixty years old.  Harris was behind a one-way glass when the men entered the shop so they could not see him.  Harris said that he recognized the man carrying the television as soon as he came into the shop.  Harris was on the phone with a customer at the time.  He said that he put the customer on hold, walked out to where the man was standing, and looked him right in the face.  The man looked at Harris and then immediately dropped his head, turned around, and walked quickly out of the shop.  Harris said that he did not talk to the man, but he told co-workers, "This is the S.O.B. that robbed me."  Trial Tr., Nov. 14, 1999 at 26.

Harris said that he tried to go after the man, but his co-workers stopped him.  By the time Harris broke free of the co-workers, the man was out of the shop and in his car.  Nevertheless, Harris was able to see  the license number of the man's car and he called the police, who came to the shop.  Harris testified that he gave the license number of the car to the responding officer and also to a couple of his police officer friends who periodically came into the pawn shop.

The older man was still in the shop when Harris returned, and he asked the man if he knew the person who was carrying the television.  The older man denied knowing the individual.  However, when the older man pawned the television Harris got his address from the store computer.  An unknown bystander told Harris that he knew the man who had held the television; Harris heard

the man say that his name was "Jamal Rando."  Harris entered that name into the store computer, but no such name came up.  Harris testified that he also conveyed that information to the police.

Harris testified that after the incident at the pawn shop, he periodically called the police inquiring about the status of the case and continued to do so for a few months after the robbery. Then in December 1998, four years after the robbery, Harris testified that his son, Loren, saw a picture of the man who had robbed him on the television nightly news.  Harris said that his son called him to look at the man that was on the television, and when he did Harris saw the picture of the man who had robbed him in 1994.  Harris testified that he heard the man's name as Jamal Randle several times on the television news; he said that Randle was being sought for a police shooting. Harris testified that he immediately recognized the image as the man who had robbed him four years earlier.  It was only then that Harris realized that he had the incorrect spelling of the robber's name. Harris then went to the police and reported that he had seen Jamal Randle's photograph on the television and told them he was the man who had robbed him.  Harris spoke with Sergeant David Mallory, who arranged for an in-person line-up at the police station for Harris and his son Loren.

However, Randle refused to stand for the in-person line-up; he believed it was not a fair line-up because Harris had seen his photograph repeatedly on television.  So Harris and his son viewed a photograph show-up.  Harris testified that both he and his son picked Randle out of the photograph show-up as the robber.

Loren Harris also testified at trial.  He said that on the day that his father was robbed, he was at his grandmother's home because she was babysitting him that day.  Loren was nine years old at the time of the robbery.  On that night his father came to pick him up, and as they were leaving his

grandmother's house a man with a gun came from the side of the house and told his father to get down on the ground. Loren said that when he saw the gun he got scared and ran back to his grandmother's house and went inside. He said that he went to a window, looked out, and saw the man take his father's wallet and his coat. He testified that he saw the man's face. He then saw the man run away after he took the property from his father. Loren then went upstairs to tell his grandmother what he had witnessed. Then Loren, his father, and his grandmother went to the police station.

Loren testified that he did not see the person who robbed his father again until he saw him on television. When Loren saw a picture of the man on television, he called to his father, who was in the bathroom at the time. His father came out of the bathroom and saw the television picture, and then they then went to the police station. At the police station, Loren was asked to look at a man in person to see if he was the one who had robbed his father. Loren testified that he never actually saw that man in person at the police station, but he did identify a photograph of the man who robbed his father. At trial, Loren identified the petitioner as the man that robbed his father.

Annie Cook next testified that she lived on Superior Street in Detroit, Michigan where she was babysitting her grandson Loren on the night in question. After Frank Harris picked him up Loren and left her apartment, Cook opened the door to lock the screen door and saw Frank Harris lying on the ground. Ms. Cook testified that she saw two men. One of the men told her to go back into the house, but she said that she simply froze at the door. Ms. Cook testified that eventually Frank Harris came back into the house and told her what had happened and they talked about going to the police.

Marion Davis, the pawnbroker, testified that he was working at the pawn shop in 1994 where Frank Harris also worked. Davis recalled an incident in which a man came into the pawn shop and Harris said to him, "Hey, that's the guy that robbed me right there." Davis said that the guy left the store at that point and Harris tried to follow him, but he stopped Harris because he did not think that there was anything that Harris could do at that point. At trial, Davis identified the petitioner as the man in the pawn shop that day.

Detroit Police Officer Clarence Lucas testified that in 1994 he was assigned to the Seventh Precinct and employed as a patrol officer. He said that he saw Frank Harris. Officer Lucas said that he was not working on the day of the pawn shop incident but did have the occasion to go there, which he did frequently. When Officer Lucas entered the shop, Harris told him that he had been robbed at gun point. Because Officer Lucas was not on duty, he told Harris to go to the Seventh Precinct and make an armed-robbery report. Officer Lucas testified that he also made his own written report of what Harris told him about the armed robbery, a copy of which was allegedly given to the detective squad at the Seventh Precinct.

Officer Lucas testified that he and Harris were acquaintances, and that he saw Harris on nearly a daily basis. According to Lucas, at some point Harris gave him some information about a license-plate number. Lucas recalled running a check of the license-plate number, but he did nothing further because he was not the investigating officer in the case.

Detroit Police Sergeant David Mallory testified that in 1994 he was the officer in charge of the investigation. That changed from 1995 to 1998, when Mallory received a new job assignment. Mallory said that when he initially received the case in 1994, he only had descriptions of the individuals involved in the robbery; he did not have any names of the individuals who might have

been involved. According to Mallory, it was not until December 9, 1998 that he was given the name of "Jamal Randle" as the individual involved in the robbery. When Sergeant Mallory became aware of the robbery suspect's name, he responded by taking statements from Annie Cook, Loren Cook, and two witnesses at the pawn shop. Sergeant Mallory explained that he "went to Homicide and ascertained if any weapons that fit the description that were used in the holdup had been confiscated in search warrants and a number of locations. [He also] reviewed some of the statements at Homicide in regards to Mr. Jamal's arrest [and] went to the Wayne County Jail and took a statement from or as much information as [he] could get from him at that time." Trial Tr., Nov. 14, 1999 at 113.

Sergeant Mallory also testified that he was aware of the incident that occurred at the pawn shop about three months after the robbery. When asked if he searched for a police report of the pawn shop incident, Sergeant Mallory testified as follows:

> At the time I typed out the warrant I had spent something like three hours looking through our archives to find the police report or an activity log that would indicate that there was a police run to [the pawn shop] and possibly the reports indicating that the [petitioner] was in fact involved in the holdup either by his actual spelling of his name or close spelling of that name.
>
> Since then, I have repeatedly gone back to those same archives in attempts to locate either the report or an activity log so that I could substantiate in fact that those things had occurred.
>
> I did substantiate that they did occur or that an incident had occurred at [the pawn shop], that the complainant had gone outside, had taken down a license number and at some point that it was in regards to the holdup.
>
> . . .
>
> I was unable to obtain a police report indicating that either the scout car was sent to the scene at [the pawn shop] or that information was put in a report that should have or would have been forwarded to me in regards to the case.

Trial Tr., Nov. 14, 1999 at 114-15.

Sergeant Mallory said that after he learned the identity of the robber, he asked Frank and Loren Harris to come to the police station to attend an in-person lineup. He made the necessary arrangements to have a defense attorney present and notified the jail that he wanted the petitioner in this case available for the in-person lineup. However, the petitioner refused to participate. As a result, Sergeant Mallory testified that he arranged for a photograph show-up with six photographs. An attorney was present for that as well, and he did not object to the array.

Mallory explained that at the photograph show-up, he first brought in Frank Harris to view the array. Sergeant Mallory testified that Harris immediately identified the petitioner as the robber before Harris even sat down. Sergeant Mallory then brought Loren in to look at the photographs. After about two minutes, Loren identified the petitioner as the man who robbed his father.

The petitioner called several defense witnesses and testified in his own behalf. His defense theory was that he was not the person who robbed Harris or the person who was identified at the pawn shop. He insisted that at the time of the robbery he suffered from injuries sustained in a 1993 shooting, and he was shot again before the pawn shop incident, which required that he either use crutches or walk with a limp, and could not carry heavy objects.

Harris contended that the "older man" who came into the pawn shop with the person carrying the television was his father, who did not testify at trial. The person carrying the television was Daniel Purvis, who was killed by the police during a robbery sometime between 1994 and 1998. It was the petitioner's position that Purvis also was the robber.

Earline Webb, the petitioner's grandmother, was the first defense witness. She testified that on or about December 3, 1993 the petitioner was shot in the knee, and she said that the petitioner

was on crutches for a month or more. According to Ms. Webb, although the petitioner no longer needed the crutches, he walked with a limp. She said that she took care of the petitioner during this time because the woman that he lived with, Felicia Pickett, worked during the day and the petitioner needed attendant care.

Ms. Webb also testified that the petitioner was shot in the back in 1994 around Valentine's Day. She said that as a result of that shooting, the petitioner lost a lung. He was in the hospital for about two weeks, she said, and he had physical therapy for about nine months afterward. Ms. Webb testified that she took care of the petitioner during the day for that period of time, and she described him as having difficulty breathing and walking. It was her testimony that the petitioner was not able to walk upright.

Felicia Pickett, the petitioner's girlfriend from 1992 to 1998, corroborated Ms. Webb's testimony. She confirmed that the petitioner was shot in the leg in 1993, and he could not walk, stand, or prepare his own meals, and he was on crutches for about six weeks. According to Ms. Pickett, the petitioner was not able to lift things until he was able to walk without crutches.

Ms. Pickett also confirmed that the petitioner was shot in the back on Valentine's Day in 1994. She testified that the petitioner was hospitalized for about two weeks, after which he was bedridden for about one month and was unable to do much of anything. Ms. Pickett also testified that the petitioner had difficulty standing, and he was not able to do so until after months of physical therapy. She said that he also had difficulty breathing, and at one point he thought he was having a heart attack because he could not breathe. It was Ms. Pickett's impression that the petitioner could not have carried a television set into a pawn shop in April or May of 1994 because he could not even carry groceries into the house. However, Ms. Pickett acknowledged that during that time, the

petitioner lived for periods with her and also spent some time with his grandmother. She testified that during April and May of 1994, he also had contact with his father, Dexter Randle.

Michelle Coleman, the petitioner's stepmother, testified that she took care of the petitioner several times during March or April of 1994. She said that after he was injured, the petitioner frequently was in pain and had trouble with shortness of breath. On cross-examination, Ms. Coleman testified that during the months of March, April, May, and June of 1994, it would have been out of the ordinary for the petitioner to be carrying something around, but it would not have been out of character for him to be walking around.

The petitioner testified that he was shot in the knee in 1993. He said that he had gone to a neighborhood store with Ms. Pickett, and upon exiting the store a man approached them demanding money. As the man was leaving, he shot the petitioner in the knee. He said he was admitted to the hospital and released the next day on crutches. He testified that he could not walk without the assistance of crutches for approximately six weeks.

The petitioner then stated that he was shot in the back on Valentine's Day 1994. He said that he was at a club with a friend when he stopped at a pay phone to make a call. He was approached by a man while he was in the phone booth, and as he tried to run away he was shot in the back. His friend who was waiting in the car was also shot. The petitioner testified that he had surgery to remove part of his lung. He testified that he was hospitalized for about two weeks as a result.

The petitioner said that he was discharged to home where he remained on total bed rest for one month. He said that he could not even sit up and feed himself during that period of time. He said that he began physical therapy around March 1994 to help him correct his posture. He could not raise his arm above his shoulder without feeling pain, and he could not lift anything over ten

pounds. The petitioner testified that he would not have been able to carry a television set during that period of time. He said that he did not leave the house except to go to physical therapy. The petitioner acknowledged that he had applied for disability payments after he was shot.

The trial court admitted the petitioner's medical records from his 1994 hospitalization and his subsequent physical therapy visits. The records were voluminous. Before trial, defense counsel discovered that the physical therapist who treated the petitioner had moved to the Philippines and was unavailable to testify. The doctor who treated the petitioner after his second surgery had moved to Ohio. There was no expert medical testimony.

On December 15, 1999, the jury sent out a note to the trial court saying that it had reached a verdict, whereupon the petitioner left the courtroom. The trial court took the verdict in his absence; the jury found the petitioner guilty as charged. The trial court then issued a capias for the petitioner's arrest and ordered his bond forfeited. The petitioner was not found until November 1, 2000, almost one year later, and he was sentenced on November 15, 2000 to prison for seven to twenty years for the armed robbery conviction and two years for the felony firearm conviction, with the terms to be served consecutively.

The petitioner filed a timely direct appeal in the Michigan Court of Appeals raising the following claims:

I.      The trial court committed legal error in denying the motion to dismiss, because the five-year delay between the alleged crime and Randle's arrest violates due process.

II.     The trial court committed legal error by not entering a directed verdict of acquittal, because the loss of witnesses and evidence, due to the pre-arrest delay, violated Randle's right to compulsory process under the Sixth and Fourteenth Amendments.

III.   A new trial is warranted, because counsel was ineffective for failing to investigate a supporting witness, failing to digest the medical reports for the jury, and failing to investigate an important witness.

IV.   Trial counsel was ineffective for not moving for a mistrial after a police witness told the jury about [the petitioner's] arrest for homicide, in violation of an order in limine.

On February 25, 2003, the Michigan Court of Appeals affirmed the convictions in an unpublished *per curiam* opinion. *People v. Randle*, 2003 WL 550004 (Mich. Ct. App. Feb. 25, 2003).

The petitioner then filed a delayed application for leave to appeal in the Michigan Supreme Court raising the same claims raised in the Michigan Court of Appeals. On August 29, 2003, the Michigan Supreme Court denied the petitioner's delayed application for lack of merit. *People v. Randle*, 469 Mich. 879, 668 N.W.2d 151 (2003).

Thereafter, the petitioner filed his petition for a writ of habeas corpus in this Court presenting the following claims:

I.   The trial court committed legal error in denying the motion to dismiss because the five-year delay between the alleged crime and Randle's arrest violates due process.

II.   The trial court committed legal error by not entering a directed verdict of acquittal because the loss of witnesses and evidence due to the pre-arrest delay violated Randle's right to compulsory process under the Sixth and Fourteenth Amendments.

III.   A new trial is warranted because counsel was ineffective for failing to digest the medical reports for the jury, and for failing to investigate an important witness.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, which govern this case, "circumscribe" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising

constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) ( internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410-11; *see also Eady v. Morgan*, 515 F.3d 587, 594-96 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Harbison v. Bell*, 408 F.3d 823, 828-29 (6th Cir. 2005); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

## A.

The main focus of the petition is on the claims of prejudice that resulted from the long delay in arresting the petitioner after the robbery and bringing him to trial.  The delay is at the heart of the petitioner's first two claims: the five-year delay between the crime and the arrest infringed his rights under the Due Process Clause, and the delay trenched upon his right to compulsory process secured by the Sixth Amendment.  He also argues that his Sixth Amendment right to a speedy trial was violated by this delay.

These issues were fully litigated in the state courts.  Before trial, the petitioner's attorney filed three motions to dismiss because of the delay in his arrest.  The trial court denied the first motion finding that the police did not know the identity of the perpetrator.  The court observed however that the police should have done more to follow up on the information from the pawn shop, run various spellings of the last name listed in the pawn shop computer, and gone to the address derived from the license-plate number.  The second motion was treated as a motion to reconsider the first, and it also was denied because it did not contain any new information.

The third motion to dismiss was based on the fact that the physical therapist who treated the petitioner after his second gunshot wound had moved to the Philippines.  In defense counsel's opinion, she was the best witness to testify to the petitioner's disabilities.  But the trial court denied that motion because there was no showing when the therapist left the United States, and there were other persons who were able to testify to the petitioner's disabilities, including friends, relatives, and other medical professionals who treated him during that time.

The petitioner's trial counsel also filed a post-trial motion for a directed verdict of acquittal or in the alternative a new trial, which was denied.

The Michigan Court of Appeals agreed with the trial court's findings and rejected the petitioner's claims that the delay warranted dismissal of the case. It stated:

> We find no abuse of discretion. The delay in this case resulted from an erroneous transcription of defendant's last name as "Rando" and an apparent recordkeeping error at the police department, which kept helpful information from reaching the appropriate investigating officer. Defendant has not shown that the prosecution intended a tactical advantage from these errors.
>
> Moreover, defendant has not shown substantial prejudice. His claim that he may have been receiving physical therapy during isolated portions of certain days beginning in April 1994 does not establish an alibi for the pre-dawn robbery in January 1994. It is unduly speculative to conclude that a "therapy" alibi would contradict the complainant's testimony that defendant was the person at the pawn shop – the therapy sessions only lasted between 45 minutes and an hour, once or twice a week, for about five weeks.
>
> Defendant also argues that the "real" robber, who he alleges was a Mr. Purvis (now deceased) could have been subpoenaed to attend defendant's trial and confess to the crime had defendant been arrested and charged sooner. We agree with the trial court, however, that it is unreasonable to conclude that Purvis would admit that he accompanied defendant's father to the pawn shop *and* confess to the crime. We also agree with the trial court that photographs of Purvis and defendant do not exhibit similarities. Accordingly, we do not believe it is likely that the complainant would have identified Purvis as the robber had Purvis been available for a live in-court viewing.

*Randle*, 2003 WL 550004 at *2.

The petitioner contends that this ruling misapplies federal law. However, the Supreme Court has held consistently that "[t]here is no constitutional right to be arrested." *Hoffa v. United States*, 385 U.S. 293, 310 (1966). Elaborating on that concept, the Court explained:

> The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

*Ibid.*

The Due Process Clause does provide some measure of protection against preindictment delay. *United States v. Lovasco,* 431 U.S. 783, 789 (1977); *see also United States v. Marion*, 404 U.S. 307, 324 (1971). But the Court once again has observed that "no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so." *Lovasco*, 431 U.S. at 792. Proof of prejudice is a necessary element of a due process claim for preindictment delay. *Lovasco,* 431 U.S. at 790. The Sixth Circuit has consistently read *Lovasco* to hold that dismissal for preindictment delay is warranted only when the defendant shows both substantial prejudice to his right to a fair trial and that the delay was intentionally imposed by the government to gain a tactical advantage. *See United States v. Brown,* 959 F.2d 63, 66 (6th Cir.1992). The prosecution of a defendant following an investigative delay does not necessarily deprive him of due process, even if his defense is somewhat prejudiced by the lapse of time. *Lovasco,* 431 U.S. at 796.

The petitioner in this case does not contend that the almost five-year delay was intentional or used by the prosecution to gain a tactical advantage. The state trial court found that the delay was not intentional and appeared to be the result of bureaucratic negligence at worst. The Court accepts that factual finding, which is consistent with the record. *See* 28 U.S.C. 2254(e)(1). However, the petitioner does argue that the delay caused him substantial prejudice. Nonetheless, the Sixth Circuit has found long periods of delay do not *ipso facto* deny due process. *Brown*, 959 F.2d at 67 (citing cases in which pre-indictment delay was thirty-three months, twenty-nine months, and five years).

The Supreme Court has acknowledged that substantial delays in charging a suspect carry the potential for prejudice, but the procedural protection against such harm is found in statutes of limitation. *Marion*, 404 U.S. at 325-26. More must be shown to establish a deprivation of due

process when a prosecution is commenced within the period of limitation. The Supreme Court explained:

> Appellees rely solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment.

*Ibid.*

The Court believes that the state court of appeals's determination that the petitioner did not demonstrate sufficient prejudice was reasonable. The petitioner claims that because of the delay he was unable to locate witnesses to support his alibi defense. But he has never alleged with specificity where he was at the time of the armed robbery, and except for Mr. Purvis not being available, he has not named any other witnesses who were denied him due to the delay in arresting him.

The petitioner suggests that witnesses' memories faded over the time between the crime and his arrest. But a vague assertion that memories have diminished, witnesses have been lost, and documents have been misplaced does not establish actual prejudice from a pre-charge delay. *United States v. Beszborn*, 21 F.3d 62, 67 (5th Cir.1994); *United States v. Mask*, 154 F. Supp. 2d 1344, 1348 (W. D. Tenn. 2001). When the claimed prejudice from a preindictment delay is the unavailability of a witness, courts require the petitioner to identify the witness that would have been called, show with specificity what the witness was expected to say, demonstrate a serious attempts to find the witness, and establish that the information that the witness would have provided was not available from other sources. *Jones v. Angelone,* 94 F.3d 900, 908 (4th Cir.1996). The petitioner has done none of this.

The petitioner's defense at trial was that he was not the one on the street on January 14, 1994 who committed the pre-dawn robbery (nor could he have done that because he was walking with crutches after having been shot in the knee about one month prior), and he was not the man who carried a television into the victim's pawn shop two to three months later because he was shot again in February 1994 and his lung had been surgically removed. No aspect of the pre-arrest delay prevented the jury from assessing these claims. Rather, the petitioner's delay argument hinges on the unreasonable expectation that Mr. Purvis would have exonerated him by coming to court and confessing to the crime. It is, of course, convenient to blame a crime on a dead man; it is far fetched to suggest that the dead man would have readily accepted the blame were he alive. The denial of such an "opportunity" to one accused of the crime is not fundamentally unfair.

The petitioner does not allege that he was prosecuted in violation of the applicable statute of limitations. The Michigan Court of Appeals found that the petitioner had not shown prejudice or an intent by the State to gain an advantage. These findings are well supported by the record. The Court concludes, therefore, that the state court's findings regarding this claim were not contrary to or an unreasonable application of federal law. The petitioner is not entitled to habeas relief regarding this claim.

B.

The petitioner also argues that the state courts should have dismissed his case on speedy trial grounds. This Court cannot agree.

To be sure, individuals charged with crimes "enjoy the right to a speedy and public trial." U.S. Const. amend. VI. However, the mere passage of time does not necessarily signal the denial of that right. For instance, courts have held that a delay of five-and-a-half years between the filing

of charges and trial abridged the right, *see United States v. Brown*, 169 F.3d 344 (6th Cir. 1999), while a delay of twenty-two years did not, *see Wilson v. Mitchell*, 250 F.3d 388 (6th Cir. 2001). In *Barker v. Wingo*, 407 U.S. 514 (1972), it was observed that the speedy trial right was "vague," "amorphous," and "slippery," and that it was not possible to ascertain with precision the time that the right was violated. *Barker*, 407 U.S. at 521-22. *See also United States v. Schreane*, 331 F.3d 548, 553 (6th Cir. 2003) (holding that "no one factor constitutes a 'necessary or sufficient condition to the finding of a deprivation of the right of speedy trial'") (quoting *Barker*, 407 U.S. at 553). The Court therefore counseled against a "rigid approach[]" and established instead a functional, four-factor test intended to account for all relevant facts, and to be applied "on an *ad hoc* basis." *Barker*, 407 U.S. at 530. The four factors identified by the Court are: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Ibid.* In *Doggett v. United States*, 505 U.S. 647, 651 (1992), the Court stated the test slightly differently: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result."

In this case, approximately eleven months elapsed between arrest and trial. That delay, although substantial, is not uncommonly long, and it does not plainly cross the threshold separating those cases that warrant further examination because of presumptive prejudice. *See id.* at 651-52 ("Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay."); *Schreane*, 331 F.3d at 553 ("[I]f the delay is not uncommonly long, judicial examination ceases."); *Wilson*, 250 F.3d at 394 ("Twenty-two years is an extraordinary delay that far exceeds this

court's guideline that a delay longer than a year is presumptively prejudicial."). Courts generally have found post-conviction delays that approach one year to be presumptively prejudicial. *Doggett*, 505 U.S. at 652 n.1; *United States v. Brown*, 90 F. Supp. 2d 841, 846 (E.D. Mich. 2000); *see also Wilson*, 250 F.3d at 394 (twenty-two years presumed prejudicial); *United States v. O'Dell*, 247 F.3d 655, 667 (6th Cir. 2001) (seven years presumed prejudicial); *United States v. Brown*, 169 F.3d 344, 348-49 (6th Cir. 1999) (five-and-one-half years presumed prejudicial).

Nevertheless, skipping forward to the last factor in *Barker*, the Supreme Court recognized that several different forms of prejudice can result from delay: loss of liberty that comes from lengthy pretrial incarceration; "anxiety" that stems from the uncertainty of a pending criminal charge; and the impairment of one's ability to mount a defense due to fading memories and other loss of exculpatory evidence. *See Barker*, 407 U.S. at 532. The third of these reasons is the most pernicious, because it "skews the fairness of the entire system." *Ibid.*

Of course, in the present case almost five years elapsed from the time of the crime to when the petitioner was charged. During that time, the petitioner's identity remained unknown until late 1998 when Harris's son recognized the petitioner's face in a television news report. That delay does not impact the petitioner's rights under the Sixth Amendment, however, because he was not yet within the criminal justice system. He has not pointed to any prejudice resulting from the delay between his arrest and trial. Nor could he, since the record is silent as to when his physical therapist left the country or his doctor moved to Ohio. There is nothing to suggest that any of this occurred in the eleven months that intervened between arrest and trial.

Nor has the petitioner shown a violation of the Compulsory Process Clause of the Sixth Amendment. Certainly, the Compulsory Process Clause of the Sixth Amendment "stands on no

lesser footing than the other Sixth Amendment rights that [the Supreme Court has] previously held applicable to the States." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). In fact, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Id.* at 408 (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). But the petitioner was able to call witnesses in his defense, and the State did not interfere with his ability to procure witnesses with the state court's assistance.

The Court finds no Sixth Amendment violation, and habeas relief premised on a violation of the federal rights protected by that amendment is not warranted.

## C.

Finally, the petitioner alleges that trial counsel was ineffective for failing to (1) "digest" the medical reports for the jury and locate and call as a witness the physical therapist who treated him, (2) investigate an important witness for the defense, namely his father who accompanied "the robber" to the pawn shop, and (3) move for a mistrial after the officer-in-charge referred to a homicide investigation that was the cause of the petitioner's television exposure. Each of these claims was presented to the state court of appeals, which rejected them in turn.

The first claim concerning the manner of presentation of medical proof was relegated to a decision of trial strategy. The appellate court stated:

> We will not second-guess [defense counsel's] decision not to call defendant's physical therapist as a witness. See *People v. Rice (On Remand)*, 235 Mich App 429, 445; 597 NW2d 843 (1999). Other defense witnesses supplied ample medical testimony. Counsel's decision not to summarize the medical records, and his closing argument in which he stated that the records were voluminous and confusing, also did not constitute ineffective assistance. The records were indeed voluminous and not easily translated by lay persons. Contrary to defendant's argument, however, trial counsel did not urge the jury to ignore the records. Instead, he asked them to focus on those portions that were written in "plain English" rather than concentrate on confusing portions. Because counsel presented ample evidence of defendant's

medical condition through witnesses, we cannot say that a different presentation of the medical records would have led to a different result.

*Randle*, 2003 WL 550004 at *4.

On the claim that trial counsel made a mistake by not calling the petitioner's father's, the

court stated:

Even assuming counsel was aware of defendant's father's testimony, based on the evidence presented, it is clear the witness' credibility would have been called into question. Counsel's reasons for failing to call defendant's father do not appear on the record and, therefore, cannot support reversal. Therefore, on this record, we are unable to find counsel was ineffective for failing to present defendant's father as a witness.

*Ibid.*

Finally, the court refused to find deficient performance in defense counsel's failure to move

for a mistrial, stating:

[T]here are no evidentiary proofs or judicial findings regarding whether a mistrial motion would have been successful or whether counsel was ineffective for failing to make such a motion. We are not persuaded that the police officer's non-responsive testimony violated the specific terms of the order in limine. The order focused on defendant's connection to the killing of a police officer; the trial testimony did not link him to the killing of a police officer or to any other killing.

*Id.* at *5.

The federal law against which these state court rulings must be measured is found in

*Strickland v. Washington*, 466 U.S. 668 (1984). There, the Court held that to show a violation of

the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his

attorney's performance was deficient and the deficient performance prejudiced the defense. *Id.* at

687. An attorney's performance is deficient if counsel's representation falls below an "objective

standard of reasonableness." *Id.* at 688. The defendant must show "that counsel made errors so

serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

The standards quoted above are precisely the ones used by the state court in assessing the petitioner's ineffective assistance of counsel claim. That court's discussion was thorough, analytical, and faithful to the record. More importantly, it properly applied Supreme Court precedent. Little would be added in rehashing the analysis. It is enough to say that the decision of the Michigan Court of Appeals was consistent with and a reasonable application of federal law.

III.

The Court concludes that the petitioner has not established that he is in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [dkt. # 3] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: March 31, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 31, 2008.

s/Felicia M. Moses
FELICIA M. MOSES